UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

DANIEL THOMPSON,
           Defendant.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
22-cr-301 (CBA)

**AMON, United States District Judge:**

Defendant Daniel Thompson is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Thompson moves to suppress physical evidence, arguing that the vehicle checkpoint that led to the discovery of the firearm at issue violated the Fourth Amendment. (ECF Docket Entry ("D.E.") # 26.) For the reasons set forth below, Thompson's motion to suppress is DENIED.

## BACKGROUND

In July 2022, a grand jury in this District returned an indictment charging Thompson with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). (D.E. # 1.) On January 25, 2023, Thompson moved to suppress "all evidence recovered on or about August 12, 2021 from the vehicle Mr. Thompson was operating"—which would include the firearm recovered from the car—arguing that the law enforcement checkpoint was unlawful and the warrantless search of the vehicle was unreasonable. (See D.E. # 26 at 2, 6-10.) The government opposed Thompson's motion and argued that a hearing was unnecessary. (See D.E. # 27.)

On February 27, 2023, I held a suppression hearing during which the Court received evidence, including testimony from New York City Police Department ("NYPD") Sergeant Tony Ip, Officer Jose Salazar, and Sergeant Philip Ditto. (See generally Feb. 27, 2023 Suppression Hr'g

1

Tr. ("Tr.").) At the hearing, the Court received fourteen exhibits from the government: (1) a weekly traffic safety form, Government Exhibit ("GX") 73; (2) a map of Intersection C in the 67th Precinct, GX-61; (3) a completed vehicle checkpoint form from August 12, 2021, GX-72; (4) an intersection collision report, GX-71; (5) a photo of the front of the white Infiniti being driven by Thompson, GX-41; (6) a photo of the back of the white Infiniti, GX-42; (7) a close-up photo of the white Infiniti's temporary back license plate, GX-52; (8) footage from Officer Salazar's bodycam, GX-23B; (9) a photo of the white Infiniti following the collision, GX-43; (10) photos of the firearm on the white Infiniti's driver's seat, GX-45, GX-46, GX-47; (11) NYPD Patrol Guide procedure for inventory searches of vehicles, GX-85; and (12) footage from Sergeant Ditto's bodycam, GX-8. Thompson did not call any witnesses or admit any exhibits into evidence.

Following the hearing, the parties filed letter briefs. (See D.E. # 37 ("Gov't Mem."); D.E. # 38 ("Def. Mem.").)

## FINDINGS OF FACT

On a motion to suppress, the defendant bears the initial burden to establish that he was subjected to a warrantless search or seizure. United States v. Herron, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980)). The burden then shifts to the government "to demonstrate by a preponderance of the evidence . . . that the search or seizure did not violate the Fourth Amendment." Id. (citations omitted). The testimony and evidence admitted at the suppression hearing established the following facts by a preponderance of the evidence.[1]

---

[1] Where I have cited testimony, I found that testimony credible following consideration of the witness's demeanor, competence, experience, and consistency with other testimony and physical evidence.

## I. Background of Testifying Officers

In August 2021, Sergeant Ip was assigned to the 67th Precinct as the traffic safety sergeant. (Tr. 7:11-19.) The 67th Precinct covers East Flatbush, in Brooklyn. (Id.) Officer Salazar has been an NYPD officer for approximately four-and-a-half years, has been involved in approximately one hundred car stops, and in August 2021 was assigned to the 67th Precinct as a patrol officer. (Id. at 37:23-39:4.) Sergeant Ditto has been a police officer for over nineteen years, has been involved in over one hundred car stops, and in August 2021 was assigned to perform patrol functions in the 67th Precinct. (Id. at 68:4-69:7.)

## II. The Events of August 12, 2021

On August 12, 2021, at approximately 9:13 p.m., NYPD officers set up a vehicle checkpoint in the 67th Precinct, at the intersection of East 53rd Street and Clarkson Avenue. (See GX-72.) According to the vehicle checkpoint form, the checkpoint was conducted at this location "because the area in question is in close proximity to acts of violence, has a high volume of motor vehicle collisions, and the area has a high volume of vehicle traffic." (Id.)

Sergeant Ditto was the supervising officer at the checkpoint, (Tr. 62:1-9), and Officer Salazar was one of the officers administering the checkpoint, (id. at 39:10-13). Officers were instructed to stop every third vehicle or any vehicle presenting visible infractions. (Id. at 40:8-22.) A white Infiniti being driven by Thompson was stopped as a part of the checkpoint. (Id. at 41:9-17.) At the time of the stop, the car was missing a front license plate. (Id. at 41:18-20; GX-41; GX-23B at 22:06:10-20.) Even before the vehicle had come to a full stop, Sergeant Ditto noticed that the back license plate was an obstructed "paper plate." (Tr. 69:16-70:6; GX-52; GX-8 at 22:06:10-22.) During the stop, one officer spoke to Thompson for approximately two minutes and Officer Salazar inspected the rear of the vehicle. (Tr. 47:5-12.) Officer Salazar noticed that there

3

was a plate cover obstructing the back license plate, which appeared to be a "temporary tag." (Tr. 42:18-43:18; GX-52.) He also noticed that there was no expiration date or state from which the plate was issued visible on the temporary license plate. (Tr. 44:7-45:1.) Officer Salazar told his partner, the officer speaking to Thompson, that the vehicle had a temporary tag. (Id. at 47:13-17; GX-23B at 22:06:50-22:07:20.)

At some point during the stop, the vehicle Thompson was driving accelerated away from the checkpoint, ran a red light, and collided with another car. (Tr. 47:18-48:8, 72:2-6; GX-23B at 22:07:39-54; GX-8 at 22:07:25-51.) Shortly after the collision, the white Infiniti became immobilized, and Thompson fled the vehicle on foot. (Tr. 48:9-16, 72:7-25.) At the time the vehicle became immobilized, it was in the middle of the street. (Id. at 72:17-19; GX-8 at 22:15:54-22:17:04.) Officers pursued Thompson on foot, and after approximately one or two minutes, Sergeant Ditto approached the immobilized vehicle. (Tr. 74:12-24.) While standing outside of the vehicle with the door closed, Sergeant Ditto observed a firearm on the driver's seat. (Id. at 75:24-76:6; GX-45; GX-46; GX-47; GX-8 at 22:08:53-22:10:22.) Sergeant Ditto then secured the vehicle and instructed other officers not to touch the vehicle, not to touch the firearm, and to request assistance from the Evidence Collection Team ("ECT"). (Tr. 77:19-78:9.) Sergeant Ditto also instructed one of the officers on the scene to wait for ECT to collect the firearm. (Id. at 78:21-79:7; GX-8 at 22:15:33-54.)

At some point after the evidence was collected, the white Infiniti was towed by NYPD Department Tow. (Tr. 79:8-17; GX-8 at 22:17:01-15.) Department Tow is responsible for bringing vehicles back to the precinct, and as part of such a tow, an inventory search is conducted. (Tr. 79:18-23.)

4

## DISCUSSION

Thompson seeks to suppress all evidence obtained as a result of the checkpoint stop. Thompson makes three post-hearing arguments. First, the checkpoint stop was unlawful because its primary purpose was crime control, and it violated requirements set forth in the NYPD Patrol Guide. (Def. Mem. 1, 5-6.[2]) Second, officers lacked reasonable suspicion that Thompson committed a traffic infraction before he was seized. (Id. at 2-3.) And third, there was no intervening circumstance between the unlawful stop and recovery of the firearm inside Thompson's vehicle that would be adequate to break the causal chain. (Id. at 7-9.) Assuming without deciding that Thompson is correct that the checkpoint was invalid and officers lacked reasonable suspicion before the seizure, I find that Thompson's commission of multiple new crimes broke the causal chain between the unlawful stop and recovery of the firearm. In addition, seizure of the firearm was independently supported by the doctrines of plain view and inevitable discovery.

I. **Even if the checkpoint was invalid, the evidence is admissible because Thompson's intervening acts broke the causal chain.**

The government contends that Thompson's flight from the checkpoint and reckless driving were intervening events that supported the officers' seizure of the gun regardless of the legality of the initial stop. (Gov't Mem. 6.) For the reasons set forth below, I agree.

The exclusionary rule bars from trial evidence that is obtained during or as a direct result of an unconstitutional seizure. Mapp v. Ohio, 367 U.S. 643, 655-56 (1961). Evidence that flows from the initial illegality is considered "fruit of the poisonous tree" and is subject to the exclusionary rule. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). However, there are several exceptions to this rule. See Utah v. Strieff, 579 U.S. 232, 238 (2016). One such exception

---

[2] Because Thompson's post-hearing submission lacks internal pagination, I refer to the ECF page numbers.

5

is the "attenuation doctrine," which provides that "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." Id.

Courts consider three factors in determining whether a sufficient intervening event has occurred: (1) "'temporal proximity' between the unconstitutional conduct and the discovery of evidence"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." Id. at 239 (quoting Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

Assuming the checkpoint stop was unconstitutional, an issue I do not reach, the first factor would favor suppressing the evidence. "Our precedents have declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." Id. (quoting Kaupp v. Texas, 538 U.S. 626, 633 (2003) (per curiam)). The Supreme Court has held that this factor militated toward suppression where the drug contraband was discovered "only minutes after the illegal stop." Id. The government concedes that this favor weighs in favor of Thompson but asserts that the other two weigh heavily in favor of the government. See United States v. Chin, 859 F. Supp. 48, 51 (E.D.N.Y. 1994) (finding seized items admissible "notwithstanding the temporal proximity between the initial stop and subsequent arrest").

The second factor—"the presence of intervening circumstances"—does not favor suppression. Courts have found, under the attenuation doctrine, that evidence is admissible when officers stop a defendant, the defendant commits a new crime, and the challenged evidence is found after the new crime is committed. For example, in United States v. Jenkins, officers who were searching a motel parking lot for evidence of narcotics trafficking approached Jenkins's car and asked him to get out. 659 F. App'x 1, 2-3 (2d Cir. 2016) (summary order). The officers

6

frisked Jenkins and upon attempting to handcuff him, Jenkins struck one of the officers and attempted to flee. Id. The officers were able to grab Jenkins and subsequently discovered drugs on his person. Id. at 3. The Second Circuit held that "[e]ven assuming that the stop and frisk of Jenkins was unlawful," it was followed by his "illegal intervening act of striking [the officer]." Id. "In short," the court reasoned, "because Jenkins could have been arrested for assaulting a law enforcement officer . . . the evidence subsequently obtained from Jenkins's arrest is not subject to the exclusionary rule." Id. Other courts in this District have found that a new crime constituted an intervening event even where the defendant was fleeing an unlawful stop. In United States v. Chin, police officers attempted to stop a defendant who fled, drove "through a red light, drove the wrong way on a number of one way streets at a high rate of speed, in one instance forcing a motorist off the road, and committed other traffic offenses." 859 F. Supp. at 51. The court determined that even though the initial stop of the defendant lacked reasonable suspicion, evidence discovered after the defendant fled was admissible because the defendant's "subsequent violations of the law . . . constituted intervening acts[.]" Id. "Although the traffic offenses presumably would not have occurred 'but for' the unlawful stop, that fact alone does not preclude admissibility." Id. (citation omitted); see also United States v. Bellamy, 592 F. Supp. 2d 308, 320-21 (E.D.N.Y. 2009) (finding evidence discovered after the defendant assaulted officers and resisted arrest admissible even though the original stop of the defendant was not supported by reasonable suspicion).

Here, as established by bodycam video and credible testimony, Thompson accelerated away from the checkpoint during the stop, drove through a red light, collided with another car, and fled the scene of the collision. (Tr. 47:18-48:16, 72:2-25; GX-23B at 22:07:40-54; GX-8 at 22:06:55-22:07:51.) This conduct violates several New York statutes. See N.Y. Penal Law § 120.20 (reckless endangerment in the second degree); N.Y. Veh. & Traf. Law § 1212 (reckless

driving); N.Y. Veh. & Traf. Law § 1110 (failing to obey a traffic control device (e.g., driving through a red light)); N.Y. Veh. & Traf. Law § 600 (leaving the scene of an accident without reporting). Accordingly, the second factor favors the government.

The third factor—"the purpose and flagrancy of the official misconduct"—is "particularly significant." Strieff, 579 U.S. at 239 (quotation marks and citation omitted). According to the Supreme Court, "[t]he third factor of the attenuation doctrine reflects [a deterrence] rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." Id. at 241. In other words, conduct that is "at most negligent" or constitutes "good-faith mistakes" is insufficient. Id. Thompson argues that the officers' conduct was "purposeful and flagrant" because the checkpoint was unauthorized and violated the procedures set forth in the NYPD Patrol Guidelines. (Def. Mem. 7-8.) But courts must not—as Thompson does—conflate the standard for an illegal stop with the standard for flagrancy. See Strieff, 579 U.S. at 243 ("For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure."). The evidence supporting Thompson's analysis of the third attenuation factor mirrors the evidence upon which he premises his argument that the checkpoint was unlawful. (Compare Def. Mem. 3-7 with id. at 8-9.) Thompson did not present evidence demonstrating that the officers' conduct was flagrant beyond that which purportedly established the unconstitutionality of the stop. Instead, officers behaved lawfully after the checkpoint was set up, and bodycam footage reflects that the officers did not behave in a way designed to provoke Thompson's flight. (GX-23B at 22:06:22-22:07:25 (officers asking Thompson questions about his license plate and driver's license)); see Strieff, 579 U.S. at 241 (finding third factor did not favor suppression and noting that "[w]hile Officer Fackrell's decision to initiate the stop was mistaken, his conduct thereafter was lawful"). Accordingly, Thompson's

8

commission of multiple new crimes in response to non-threatening police behavior supports application of the attenuation doctrine here.

### II. Seizure of the firearm is also supported by the doctrines of plain view and inevitable discovery.

The government further contends that seizure of the evidence in Thompson's vehicle was independently valid because: (1) the firearm was visible in plain view to officers on the street, and (2) the firearm would have been inevitably discovered through an inventory search. Thompson does not challenge either argument.

"The 'plain view' doctrine is a recognized exception to the Fourth Amendment requirement of a warrant for seizures." United States v. Delva, 858 F.3d 135, 149 (2d Cir. 2017) (citing Horton v. California, 496 U.S. 128, 134 (1990)). A defendant generally has "no legitimate expectation of privacy . . . shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." Texas v. Brown, 460 U.S. 730, 740 (1983). Under the plain-view exception, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). Sergeant Ditto testified that he saw the firearm in plain view on the driver's seat while standing outside of the white Infiniti when the car door was closed. (Tr. 75:24-76:6.) The government also introduced photographs depicting the firearm on the right side of the driver's seat (not obscured or hidden), and Sergeant Ditto testified that the exhibits were fair and accurate representations of the firearm's positioning in the vehicle when he first observed it. (Id. at 76:7-17; GX-45, GX-46, GX-47.) At the time Sergeant Ditto observed the firearm, he was standing on a public street in the middle of the road. (GX-8 at 22:09:04-10.) Accordingly, the firearm was properly seized pursuant to the plain-view doctrine. See, e.g., United States v.

Levy, 217 F. Supp. 3d 643, 667-68 (E.D.N.Y. 2016) (finding that, even if the search was unlawful, "[the] defendant's gun was visible to anyone standing at the open door of the car, and the incriminating nature of the gun was immediately apparent to anyone observing it").

The government also produced unchallenged evidence that the firearm would have been inevitably discovered during an inventory search. "Under the inevitable discovery doctrine, evidence that was illegally obtained will not be suppressed if the government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation." United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002) (internal quotation marks and citation omitted). Courts have therefore upheld the admissibility of evidence obtained after invalid seizures where it would "nonetheless have been discovered in the course of a valid inventory search conducted pursuant to standardized, established procedures." Id. at 138.

In such cases, the government must prove three things: (1) the police had legitimate custody of the vehicle such that an inventory search would be justified; (2) the inventory search was conducted pursuant to "established" or "standardized" procedures; and (3) those inventory procedures would have "inevitably" led to the "discovery" of the challenged evidence. Id. (quoting United States v. Griffiths, 47 F.3d 74, 77-78 (2d Cir. 1995)).

Officer Salazar testified that Thompson could not keep driving after the collision because the vehicle had become immobilized. (Tr. 48:9-16.) At the time the car became immobilized, it was in the middle of the street. (Id. at 72:7-19; GX-8 at 22:17:04-15.) As a result, officers on the scene called NYPD Department Tow, the team responsible for bringing vehicles back to the precinct to be vouchered. (Tr. 79:8-20.) NYPD policy provides that as part of a Department Tow, officers conduct an inventory search of the property in the vehicle. (Id. at 79:21-80:1; GX-85 (NYPD Patrol Guide procedure for inventory searches of vehicles).) Because the firearm was

clearly visible on the driver's seat of the vehicle, it would have been inevitably discovered during this valid inventory search. Accordingly, even if the initial stop was unlawful, the challenged evidence would have been inevitably discovered.

## CONCLUSION

For the foregoing reasons, Thompson's motion to suppress is DENIED.

SO ORDERED.

Dated: May  3 , 2023
Brooklyn, New York

s/Carol Bagley Amon
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Carol Bagley Amon
United States District Judge